# ATTACHMENT 20a

# In The Matter Of:

*Nestor v*

*VPC3 II, LLP*

---

*Proceedings Held Before The Honorable Jack Day*

*Vol. I*

*September 4, 2014*

---

*Executive Reporting Service*

*Clearwater, Florida 33762*

*Phone: (727)823-4155/ (800)337-7740*

*Fax: (800)621-9077*

*www.executivereporting.com*

Kelley N. Simpson

2014.10.13 18:31:08

Signer:
CN=Kelley N. Simpson
O=VeriSign, Inc.
E=h3mom@tampabay.rr.com

1

IN THE CIRCUIT COURT OF THE SIXTH
JUDICIAL CIRCUIT OF THE STATE OF FLORIDA,
IN AND FOR PINELLAS COUNTY, FLORIDA

CASE NO.: 14-002358-CI

THOMAS J. NESTOR,

      Plaintiff/Counter Respondent,

      -vs-

VPC3 II, LLP,

      Defendant/Counter Petitioner.

------------------------------------------/

PROCEEDINGS HELD BEFORE
THE HONORABLE JACK DAY

DATE TAKEN:        Thursday, September 4, 2014

TIME:            Commencing at 11:40 a.m.

PLACE:          Pinellas County Courthouse
                 545 First Avenue North
                 Room 200
                 St. Petersburg, Florida  33701

Proceedings reported by:

Kelley N. Simpson, RPR, FPR
Executive Reporting Service
Ulmerton Business Center, Suite 100
13555 Automobile Boulevard
Clearwater, Florida 33762

2

1   APPEARANCES:

2                    RUSSELL L. CHEATHAM, III, ESQUIRE
                       Law Office of Russell L. Cheatham
3                    5546 First Avenue North
                    St. Petersburg, Florida  33710
4                    (727) 346-2400

5                         Attorney for the Plaintiff

6

7                    ALICE R. HUNEYCUTT, ESQUIRE
                    DARRIN J. QUAM, ESQUIRE
                    Stearns, Weaver, Miller
8                    401 East Jackson Street
                    Suite 2200
9                    Tampa, Florida  33601
                    (813) 223-4800
10                  ahuneycutt@stearnsweaver.com

11                     Attorney for the Intervenor
                     N.E. Apartments Associates, Inc.
12

13                    CAMILLE J. IURILLO, ESQUIRE
                    Iurillo Law Group, P.A.
14                  5628 Central Avenue
                    St. Petersburg, Florida  33707
15                  (727) 895-8050
                    Ciurillo@iurillolaw.com
16
                     Attorney for the Defendant
17

18                   I N D E X

19                                   PAGE

20   Proceedings                            3

21   Certificate of Court Reporter          62

22

23

24

25

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

3

1                    P R O C E E D I N G S

2          THE COURT:  Please have a seat.  Does anybody

3     have a copy of the Order I entered on the

4     Settlement Agreement?  It's here among the

5     exhibits.  Or if you tell me what exhibit it is to

6     some extended file --

7          I'll ask counsel and parties to identify

8     themselves for the record.

9          MS. IURILLO:  Camille Iurillo on behalf of

10    PVC.  In the courtroom today are Mr. Powell and

11    Mr. Carver.  Thank you.

12         MS. HUNEYCUTT:  I'm Allison Huneycutt on

13    behalf of N.E. Apartment Associates, and with me

14    is the principal, Mr. Connor.

15         MR. CHEATHAM:  Russell Cheatham, attorney for

16    Thomas Nestor.  This is Mr. Nestor, to my left.

17         MR. QUAM:  And I'm Darrin Quam, also

18    representing N.E. Apartments.

19         THE COURT:  Who is going to argue on behalf

20    of N.E. Apartments?

21         MR. QUAM:  Alice Huneycutt.

22         THE COURT:  Would you tell us your last name?

23         MR. QUAM:  Quam, Q-u-a-m.

24         THE COURT:  Thank you.  Anybody else?  Okay.

25         Okay, we're here -- I have VPC -- your motion

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

4

1        is titled emergency motion, but there are more --

2        it's about six weeks old now.  I know there was an

3        attempt to set them in July.  I was -- I had

4        surgery a month ago and was out most of August.  I

5        guess that's why we're here now.

6             So I have VPC's Motion, with an amendment,

7        and N.E. Apartment's motion.

8             Did anybody set anything else for today?

9             MR. CHEATHAM:  No, Your Honor.

10            THE COURT:  Okay.  Mr. Cheatham, I don't have

11       anything from you.  Not that that's necessary.  I

12       want to make sure.

13            Did you file any papers in regards to this

14       hearing?

15            MR. CHEATHAM:  I did not file a response.

16            THE COURT:  So I'm not missing anything?

17            MR. CHEATHAM:  No, sir.

18            THE COURT:  Well, as is my somewhat quirky

19       custom, I've got quite a volume of material here

20       I've reviewed on behalf of the moving party.

21            Let me look to you, Mr. Cheatham.  It

22       somewhat speaks for itself as far as -- tell me

23       what your response is on behalf of Mr. Nestor.

24            MR. CHEATHAM:  Judge, this was a case, if you

25       recall --

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

5

1          THE COURT:  I recall the case.

2          MR. CHEATHAM:  The Settlement Agreement was

3     entered into.  You entered an Order approving it.

4          The Settlement Agreement specifically

5     provided at page 3, "It is hereby stipulated and

6     agreed between Nestor and PCV subject to approval

7     of the Court, the Nestor contract is reinstated.

8     Nestors should have until 5:00 p.m. EDT on

9     July 15, 2014, to close on the purchase of the

10    subject property -- and this is the important

11    part -- by delivering the closing documents and

12    funds to VPC pursuant to the Nestor contract."

13         It goes on to say if he does not comply with

14    that provision, that his contract is void and the

15    contract is terminated and in fact this contract

16    will be entered into.

17         THE COURT:  They contend your client did not

18    meet the requirements of that phrase you just

19    identified.  You're going to tell me that --

20         MR. CHEATHAM:  He did.

21         THE COURT:  -- he did.  Thank you.

22         Let me take a minute and go back to -- well,

23    I'm going to go back to -- let me just clarify.

24    My impression is that VPC and N.E. Apartments,

25    although they're asking for somewhat different

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

6

1  relief because they're different circumstances,

2  you are essentially in the same boat today;

3  correct?

4      MS. IURILLO:  Your Honor, Camille --

5      THE COURT:  That was a yes-or-no question,

6  Ms. Iurillo.  I know who you are.

7      MS. IURILLO:  Yes, Your Honor.

8      THE COURT:  Okay.  So let me just -- I don't

9  want to deprive anybody of their say, but if one

10  of you can answer for both parties on the more

11  basic stuff, it will be helpful.

12      The contention as to performance and

13  delivering closing documents, I know there is an

14  issue about a $72,000 portion.

15      MS. IURILLO:  That's correct, Your Honor.

16      THE COURT:  Is that the main -- that's not

17  the main --

18      MS. IURILLO:  That is not the main.  I think

19  in two minutes or less I can tell you what the

20  points are.

21      THE COURT:  You said the magic word; two

22  minutes or less.  Go.

23      MS. IURILLO:  Your Honor, I am -- thank you

24  for you reviewing all the pleadings so I'm not

25  going to belabor what the pleadings say.  I assume

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

7

1    you understand them and if you have any questions,

2    you'll ask me.

3         There are really three -- two issues here.

4    The first issue is the most important issue and

5    easy issue for Your Honor to decide today, and

6    that is that the Settlement Agreement and the

7    contract, that's the contract that Mr. Cheatham

8    stated to Your Honor was reinstated and all

9    obligations and responsibilities of the parties

10   set forth in the contract are in full force and

11   effect.  That's a quote from the June 26th

12   hearing.

13        Well, one of those provisions is that the

14   contract, in paragraph 8.2, provides that Nestor

15   may assign the contract to a related party.  The

16   Settlement Agreement provides that Nestor can

17   assign, again, to a related party.  That is the

18   fatal flaw in contravention of what happened at

19   4:16 on the -- the 15th -- that's 14 minutes

20   before the deadline to close, I, on behalf of VPC,

21   received notice for the first time that an entity

22   called Boy Scout Holdings would be the entity

23   closing.

24        We subsequently, through discovery -- and we

25   have a deposition transcript that we can hand up

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

8

1        to Your Honor, and Mr. Cheatham has a copy -- of

2        Mr. Nestor wherein he admits that Boy Scout

3        Holding is an unrelated party.  And also, the

4        contract provides that assignment must be preceded

5        with notice to VPC3.  Fourteen minutes before the

6        drop-dead deadline, counsel for VPC was not

7        noticed.

8            THE COURT:  You're saying that you're without

9        diminishing the accordance of your own issues --

10           MS. IURILLO:  That is correct.

11           THE COURT:  -- the number one issue is that

12       it's not an related entity, a related party.

13           MS. IURILLO:  That is correct.

14           THE COURT:  You still have 30 seconds left.

15       I'm going to let you reserve that.  You actually

16       have more than that, but you had half an hour for

17       this hearing and we've spent half of it -- if you

18       had let me know you had posse, we could have

19       reserved space ahead of time.  But whatever.

20           Mr. Cheatham -- I want to hear what

21       Mr. Cheatham has to say as to related issue.  And

22       you can argue from the table.  That's okay.

23           MR. CHEATHAM:  Judge, the only mention of

24       assignability is in the actual contract itself.

25       It is not specifically --

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

9

1          THE COURT:  In the original contract?

2          MR. CHEATHAM:  In the original contract.  I

3     assume what Ms. Iurillo is asking the Court to do

4     by saying the contract reinstated, somehow it

5     reiterated that in the Settlement Agreement.  The

6     Settlement Agreement is silent to that.

7          THE COURT:  So -- so you're saying the

8     Settlement Agreement and points to the closing

9     documents and points, in terms of the contract,

10    that does not -- that does not revitalize the

11    requirement that the assignment needs to be a

12    related party?

13         MR. CHEATHAM:  No, the contract still says

14    what the contract says.  I understood the argument

15    to be that there was a separate and distinct

16    recitation in the Settlement Agreement with regard

17    to assignment.

18         THE COURT:  Is it your position that Boy

19    Scout was a related party?

20         MR. CHEATHAM:  No, Your Honor, my position is

21    multifold.  Number one, they were given written

22    notice several days before the Nestor attempt was

23    going to assign the contract, specifically to

24    counsel at Ms. Huneycutt's office, documents and

25    e-mails and --

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

10

1              THE COURT:  I'm sorry; I'd like to -- I'm

2        very linear and I like to take one thing at a

3        time.

4              I want to focus on related party.

5              MR. CHEATHAM:  Okay.

6              THE COURT:  Do you maintain that it is

7        related or that is not a material provision or

8        that it was waived?  What is your --

9              MR. CHEATHAM:  We maintain it was waived,

10       it's an unenforceable provision, and that the

11       parties waived that requirement even subsequent to

12       closing by their actions.

13             THE COURT:  You mean before closing?

14             MR. CHEATHAM:  Both before and after.

15             THE COURT:  Okay.  So they're not trying --

16       to make them related, what is your basis for

17       waiver?  I don't -- well, let's focus on before

18       closing.  How did they waive it before closing?

19             MR. CHEATHAM:  Prior to closing, in at least

20       two prior instances a non-related entity was

21       approved for an assignment of contract.  Prior to

22       closing the verbiage --

23             THE COURT:  But neither one of those is Boy

24       Scout; right?

25             MR. CHEATHAM:  None of -- two different

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

11

1    parties other than Boy Scout.

2         Prior to the closing -- the language of the

3    contract is very specific with regard to Florida

4    law.  Florida law is crystal clear that a

5    prohibition on assignability must be a specific

6    "You cannot assign this contract" language.

7         This isn't the first time we've jousted with

8    unartful language in this contract.  But the

9    language in this contract does not specifically

10   prohibit assignment.  You can't imply that that

11   language specifically prohibits assignment.  And

12   actually, to deal with that factor, I've got the

13   Florida Association of Realtors Commercial

14   Contract that tracks that language, but then adds

15   language that otherwise this contract may -- check

16   the box -- or may not be enforced.

17        And as I pointed out, the Florida law is that

18   contracts are freely assignable unless

19   specifically the contract --

20        THE COURT:  Well, let me -- somebody direct

21   me to the provision in the original contract about

22   assignability.

23        It would help -- which exhibit?  I'm working

24   with the stack of exhibits attached to VPC's

25   motion because I've got it.  That's an exhibit

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

12

 1        here.  Is that A?

 2              MS. IURILLO:  It is, Your Honor.  And I do

 3        have a notebook for Your Honor tabbed with the

 4        exhibits.

 5              THE COURT:  That's what I'm working with.

 6        It's probably A through --

 7              MS. IURILLO:  It's probably easier to look

 8        at --

 9              THE COURT:  This is easy; just tell me which

10        letter?

11              MS. IURILLO:  Exhibit A.

12              THE COURT:  Okay, I got A.  Now tell me what

13        part of that --

14              MS. HUNEYCUTT:  It's 18(f) and it's up on the

15        screen, Your Honor.  18(f).

16              THE COURT:  F as in friend?  Instead of being

17        a prohibition, it's a grant, which, and I can

18        see -- the argument is the prohibition was

19        implied, right?

20              THE REPORTER:  Your Honor, I can't hear you

21        very well.

22              THE COURT:  Nobody can.  But actually -- if

23        you can't hear me, yell.  Are you-all hearing me

24        all right?

25              MS. HUNEYCUTT:  It's a little difficult.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

13

1          THE COURT:  I'll try to speak up.

2          THE REPORTER:  Thank you.

3          THE COURT:  So Ms. Iurillo and Ms. Huneycutt,

4     you're arguing that the inclusion constitutes a

5     prohibition on assignment to an unrelated --

6     unless it's approved?

7          MS. IURILLO:  That's correct, Your Honor.

8     And there are other provisions in the Purchase and

9     Sale Agreement that make -- that are a lot more

10    complex than Mr. Cheatham refers to.

11         THE COURT:  Talk to me about whether that's

12    material.  I remember there were some issues

13    about -- I think there were some issues about

14    financial benefits rebounding to other entities

15    and so forth.

16         Is that what you're getting at?

17         MS. IURILLO:  Yes, Your Honor.  There is a

18    TDR agreement and a royalty agreement that inures

19    to the benefit of both the buyer and the seller.

20    That royalty agreement specifically is tied to the

21    type and nature of the project.  And quite

22    frankly, the type and nature of the project

23    contemplated both by Mr. Nestor and by the backup,

24    by N.E. Apartments, so that there was -- the

25    reason why the price is what it is is because

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

14

1          there is an interest in future royalties.

2               Also, the type and nature of the business and

3          the structure of the property supports the TDRs,

4          which will also -- pursuant to the agreement, are

5          inured to the benefit of both the seller and the

6          buyer.  So if it was, for instance, sold to an

7          unrelated entity who planned to build an apartment

8          complex, that would be contrary to the intent of

9          the very documents that provide future benefits to

10         the seller, and specifically relate to why the

11         price of the property was what it was.

12              So it is clearly very material.

13              THE COURT:  Mr. Cheatham?

14              MR. CHEATHAM:  Yes, Your Honor.  That's

15         the -- type and nature of the project is not

16         recited in the contract.  It's a straightforward

17         Purchase and Sale Agreement of a piece of real

18         estate, the historic YMCA building.

19              THE COURT:  My question to her was why -- why

20         is related -- the word "related," what's the

21         materiality of it?

22              MR. CHEATHAM:  What is the materiality of the

23         word "related"?

24              THE COURT:  Yes.

25              MR. CHEATHAM:  I don't see any.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

15

```
 1           THE COURT:  Well, she did.  She's saying the
 2      "related" was to have the effect of protecting
 3      that future financial benefit to the seller.
 4           MR. CHEATHAM:  Well, there is no future
 5      financial benefit contemplated in the Purchase and
 6      Sale Agreement; it's to buy a piece of property.
 7      In the negotiations and preparing that TDR
 8      agreement and royalty agreement, the e-mails go
 9      back and forth where counsel was on notice that
10      Nestor was going to assign it.
11           It was specifically -- those agreements were
12      specifically drafted to provide for Nestor and his
13      asset -- or his assignee to be bound by those
14      agreements.  Those agreements were signed by the
15      assignee, and delivered to the title company
16      before the July 15th date.
17           THE COURT:  The assignee you're talking about
18      is Boy Scout?
19           MR. CHEATHAM:  Boy Scout.
20           THE COURT:  The prior non-related
21      assignments -- proposed assignments that were
22      approved and pointing to a basic waiver, in those
23      cases they were expressly or implicitly approved
24      by actions of the seller?
25           MR. CHEATHAM:  Yes, that's what we contend,
```

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

16

1          Your Honor.

2              MS. IURILLO:  Your Honor, we -- myself and my

3          clients are unaware of any assignee that was

4          approved and any non-related assignee that was

5          approved.  So --

6              THE COURT:  Okay.

7              MS. IURILLO:  -- there's no evidence or

8          knowledge on this side of the table.

9              THE COURT:  Who are you talking about?

10             MR. CHEATHAM:  Who am I talking about?  Prior

11         assignment to Christian Yepes, trustee of the

12         Monticello Trust, NA, dated 11/23/2011, and a

13         prior assignment to Historic Venue, LLC.

14             THE COURT:  Do you want to address that?

15             MS. IURILLO:  Your Honor, my client is not

16         familiar with these documents and we expect there

17         is no signature by VPC approving them.

18             And also, there are additional provisions in

19         the Purchase and Sale Agreement itself that deal

20         with the TDR and the royalty agreements, on

21         page 2, paragraph B -- paragraph 2, I'm sorry; sub

22         B, as well as paragraph K.

23             So two issues; one, no assignments approved

24         by the sellers; and number two, additional

25         material provisions going to the root of what

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

17

1          we're talking about today.

2               THE COURT:  I'm sorry; you're referring to

3          the original contract; weren't you?

4               MS. IURILLO:  Correct.

5               THE COURT:  2(b).

6               MS. IURILLO:  Exhibit A, 2(a), sorry --

7          paragraph, very last paragraph.  It says, "In

8          addition to the purchase price, a 10 percent

9          royalty" --

10              THE COURT:  Got it.  Okay.

11              Actually, I was angling for something else

12         about the waiver, if it was -- if it was approved

13         after notice -- you're contending it was approved

14         by the sellers.  And this one was not.  That

15         wouldn't necessarily constitute a waiver of all

16         future assignments, but I'm interested.

17              MR. CHEATHAM:  No, it doesn't automatically

18         confer a waiver as to future assignments, but it

19         does go to the interpretation and the parties'

20         intent in interpreting the contract that they had

21         contemplated prior an assignment of the contract,

22         they contemplated immediately prior to this sale

23         and assignment, including structuring of the

24         royalty agreement, TDR agreement, covenants

25         running with the land would bind the new

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

18

1       purchaser.  The royalty provision provides for a
2       guarantee payment within a period of time of
3       $50,000 every year with a buyout of 300,000.  So
4       whether or not anything ever came to fruition with
5       regard to royalties, the payments were still due
6       and still had a minimum payment due of 50,000 a
7       year over 30 years, or a buyout of 300,000.  That
8       was a covenant that was structured to Nestor's
9       assignee.  And that document, running with the
10      land -- and again, that was signed and bound Boy
11      Scout.
12          Likewise, with the TDR agreements, that's a
13      little bit more of an iffy factor; it's if they
14      are able to be sold.  It doesn't require them to
15      be able to be sold, but if they are sold,
16      buyers and the buyer's able to maintain the TDRs,
17      then the buyer and seller would share the proceeds
18      of the sale of any subsequent TDR.  It doesn't
19      even guarantee that those TDRs will result in
20      that; it just says if the buyer is able to
21      maintain them.
22          THE COURT:  Let me get the other breach
23      grounds on the table.  The first was assignment to
24      an unrelated party.  I know there was an issue
25      about the 72,000.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

19

1          Was there also an issue about the type of

2     funds that were provided?

3          MS. IURILLO:  Yes, Your Honor.

4          THE COURT:  Remind me of --

5          MS. IURILLO:  Well, there's a long history

6     behind it.  I'll start with the end, and if Your

7     Honor allows, we'll get to the end.  It's how we

8     get there is very important.

9          THE COURT:  People have a deal, you know.

10    And I don't need to -- if it says you'll wear a

11    pink beanie to closing, I don't need to know

12    initially why that was put in there; okay?  If

13    somebody comes back and says that was a material

14    breach, we can go into the whys and what-fors.

15    Just tell me about the funds issue.

16         MS. IURILLO:  There is $72,000 that was a

17    nonrefundable deposit that we talked about, Your

18    Honor, a number of times in hearings.  And that

19    was owed by Nestor.  And the consideration given

20    was extensions from March, April, May and June.

21    And that totaled $72,000.  That was to be paid.

22         We were before Your Honor in hearing, wherein

23    Mr. Cheatham agreed to hold that in his trust

24    account, although VPC contended that those funds

25    must be paid immediately for the contract to be in

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

20

1       force.

2            In fact, in the deposition testimony

3       Mr. Nestor will acknowledge that failure to pay

4       the 72,000 would make the contract unenforceable.

5       To date, we do not have that 72,000.

6            And getting back to your question, Your

7       Honor, that 72,000, was not paid at closing.  The

8       amount of the closing was short the 72,000.

9            It was delivered at approximately 6:30 by

10      Mr. Cheatham at my office in not readily available

11      funds in the form of a check from his trust

12      account for 72,000.  I could only cash that check

13      under the condition that I agreed that the closing

14      had been satisfactorily completed.  However, we

15      had a Settlement Agreement that says at 5:01, if

16      the full amounts of the funds are not paid in

17      readily available funds, the contract is

18      terminated.

19           We asked N.E. Apartments.  They said if we

20      accepted the funds and transferred the deeds, we

21      would be subject to a lawsuit for breaching the

22      agreement.

23           So that is -- that is some of the background

24      around the 72,000 that was tendered past the 5:00

25      deadline, after the 5:01 deadline, and not in

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

21

1      readily available funds.

2           THE COURT:  What do you say?  Is 72,000 a

3      part of the amounts due at closing, Mr. Cheatham?

4           MR. CHEATHAM:  That seems to be the crux of

5      the issue, Your Honor.

6           THE COURT:  I understand that's what she

7      says; I'm asking if you dispute that.

8           MR. CHEATHAM:  No, it was -- it should have

9      been paid in the closing.  What happened -- I have

10     to go back a little bit.  In the -- in the initial

11     lawsuit before the settlement was reached, Ms.

12     Iurillo filed a motion to deposit that 72 in the

13     registry of the Court.  We then entered into a

14     very extensive Settlement Agreement in chambers,

15     reduced to writing, chop, chop, as Your Honor

16     ordered us to, that was silent as to when that

17     72,000 would be paid.  It didn't even mention it.

18          But at all times, Mr. Nestor acknowledges

19     that it was contemplated that it would be paid as

20     part of the final closing.  In fact, on the day

21     before, or two days before closing, Ms. Iurillo

22     wrote to the title company saying the money is not

23     coming from Mr. Cheatham's trust account; it's

24     coming from the buyers as part of the purchase

25     price; modify your closing statement to show that.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

22

1            As a result, a closing statement --

2            THE COURT:  I'm sorry; I -- I want to hear

3       that again.  Is that -- is that an exhibit?

4            MR. CHEATHAM:  That is an exhibit.

5            THE COURT:  Cite me to that.  You know,

6       it's -- do we know what exhibit that is in the

7       A-through-R package?  Is it K?

8            MR. CHEATHAM:  It's July 14.

9            THE COURT:  Yeah, I'm looking at it.  It's K.

10           MR. CHEATHAM:  I don't have her tabbed

11      exhibits, so I don't know.

12           MS. IURILLO:  I don't know, Your Honor,

13      whether that is part of my exhibits.

14           THE COURT:  I'm looking at an e-mail string

15      that starts July 14th at 7:58 a.m. from Cheatham

16      to Bergeron, and ends at 10:04 a.m. from Iurillo

17      to Cheatham, Williams and Bevins.  Is that what

18      we're talking about?  And in between it's going to

19      somebody with an e-mail address "nofo" sent to

20      several people.

21           MR. CHEATHAM:  Judge, I can provide the

22      e-mail string regarding that.  It's one of my

23      exhibits.  I can provide that to the Court as

24      well, if you want that actual e-mail.

25           THE COURT:  Is that what I've got here in my

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

23

1      hand?  It sounds --

2           MS. IURILLO:  Your Honor, I'm not finding it

3      as part of my exhibits at the moment.

4           THE COURT:  Why don't you both come up here

5      and tell me if this is what you're talking about?

6           MS. IURILLO:  We contend this is material,

7      but that's not the one Mr. Cheatham is referring

8      to.

9           MS. HUNEYCUTT:  I believe the one he is

10     referring to is July 14 at 4:45.  These are from

11     my exhibits, Your Honor.  I didn't give them to

12     you yet, but I do have those numbered.

13          THE COURT:  I had high hopes for getting

14     through this hearing.

15          July 14 at 4:00 something?

16          MS. HUNEYCUTT:  4:45.

17          THE COURT:  These are sequential from whom to

18     whom?  Oh, Iurillo to --

19          MS. HUNEYCUTT:  Cheatham.

20          THE COURT:  I got it.  It looks like this?

21          MS. IURILLO:  That's correct, Your Honor.

22     And just for the record, that's Exhibit M as in

23     Michael to VPC's motion.

24          MR. CHEATHAM:  Do you still need us up here,

25     Judge?

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

24

1          THE COURT:  No.  Well, I need -- just tell

2     me -- should I turn my attention to the last

3     couple paragraphs?

4          MR. CHEATHAM:  I'm referring to the

5     paragraph, second --

6          THE COURT:  Oh, Mr. Bergeron?

7          MR. CHEATHAM:  Yes.

8          THE COURT:  I'll just read that into the

9     record.  It's short.

10         Mr. Cheatham has clarified with me today that

11    no monies will be coming from his trust account

12    and his communication with the title company was

13    only for the purpose of clarifying credits for

14    four months of payments made to him.  But the

15    total amount of the payments made to his trust

16    account will not come from him, but instead will

17    be coming from the funding he arranged by Nestor

18    from undisclosed third parties.  And I defer to

19    Mr. Cheatham and the title company whether the

20    HUD-1 correctly articulates this calculation.

21         That's what you're referring to, Ms. Iurillo?

22    When we started this conversation?

23         MR. CHEATHAM:  I think it was me.

24         MS. IURILLO:  Mr. Cheatham referred to it

25    and --

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

25

1          THE COURT:  Let me ask.  What are -- remind
2      me now why you referred to it?  And you can go
3      back to your tables now.
4          MR. CHEATHAM:  Judge, the reason I referred.
5          THE COURT:  I'm sorry.  Okay, you all owe a
6      great deal of thanks to my judicial assistant who
7      just moved my meeting that was supposed to start
8      nine minutes ago, so we have -- we have more time.
9          MS. IURILLO:  Thank you, Your Honor.
10          MR. CHEATHAM:  The reason why I was referring
11      to that, Your Honor, is the reason the payment was
12      short was because the title company made an error
13      on the HUD-1 statement.  Both the draft that
14      everybody approved and the final HUD-1 that wasn't
15      actually delivered until -- to me until 5:58.  But
16      the purpose of that was to indicate that the
17      original draft of the HUD-1 closing statement
18      showed money being paid from my trust account in
19      the correct column where the money -- I would have
20      to deliver that money, and the purchase price
21      reflected a credit for that money.
22          After this instruction, the HUD-1 was
23      changed; the overall purchase price funds due from
24      the seller changed; the famous -- or in this case
25      the infamous line 303, funds due to seller to

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

26

1      close, that number changed as well, and for some

2      reason, the title company shifted payments due

3      from borrower or from buyer over to buyer's side,

4      but did not include those funds in the line 303

5      amount.

6           Ms. Iurillo and her client approved the line

7      303.

8           MS. IURILLO:  I object, Your Honor, to that

9      testimony being read into the record.

10          THE COURT:  It's not testimony.

11          MS. IURILLO:  That proffer.  Excuse me, Your

12     Honor.

13          THE COURT:  You're disagreeing with the

14     statement.  You'll get a chance to talk.

15          MS. IURILLO:  Thank you.

16          THE COURT:  But he's saying -- I'm still

17     losing the thread of this.  This says that the --

18     in my innocence, I'm reading this to say that the

19     other $72,000 is not going to come from the trust

20     account, but will be included in what's wired.

21          MR. CHEATHAM:  It will be included in what

22     the buyer has to wire to the title company, yes,

23     sir.

24          THE COURT:  But my understanding is they're

25     objecting to that not having happened.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

27

1          MR. CHEATHAM:  Well, and I'll tell you why it

2     didn't happen.  Because the title insurance

3     company, in the draft of -- the draft closing

4     statement generated at 8:41 that morning said,

5     line 303, cash from buyer, this is what needs to

6     be paid:  1,202,284.59.

7          THE COURT:  Let me try to say it

8     simplistically while I've got you here.

9          You're saying the amount reflected in the

10     last word to your client from the title company as

11     cash due at closing is the amount that was wired?

12          MR. CHEATHAM:  Yes, sir.

13          THE COURT:  And you're saying the -- this was

14     a title company -- we'll call it miscommunication;

15     and that therefore, the 72,000, which was also due

16     at closing by virtue of being nonrefundable

17     deposits which had been escrowed, that you,

18     therefore, tendered that with your trust account

19     check?

20          MR. CHEATHAM:  That's what happened.  When

21     the title company communicated that we made a

22     mistake, it's wrong, I immediately called Ms.

23     Iurillo.  She confirmed there was somebody at her

24     office.  She did not -- she specifically told me,

25     "I can't take that."  And I wouldn't imply that

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

28

1    she did.  But I still delivered a check for the

2    missing 72,000 that was created by the title

3    insurance company's error immediately upon being

4    made aware of it.

5        THE COURT:  Okay.  Ms. Iurillo, what did you

6    want to tell me about that?

7        MS. IURILLO:  I always can't help myself but

8    stand up.  Anyway, Your Honor --

9        THE COURT:  You're welcome to stand.

10   Sometimes I think I think better by standing.

11       MS. IURILLO:  Exactly.

12       THE COURT:  If you want to show me the slide

13   show, we have a screen over there.

14       MS. IURILLO:  Actually, I'm going to do a

15   quick summary and let Ms. Huneycutt take over the

16   details.

17       Your Honor, I want to first say this is a red

18   herring.  You will see from Ms. Honeycutt's

19   explanation that Mr. Cheatham and Mr. Nestor drove

20   what happened on these HUDs.  We didn't know

21   whether there was a buyer; we didn't know who was

22   the buyer; we didn't know where the money was

23   coming from; we didn't know when the money was

24   coming from; we didn't even know who the buyer was

25   until 4:16 (sic).  That is 14 minutes before the

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

29

1      deadline.

2          With that preface, I will let Ms. Huneycutt

3      explain how the whole HUD process was driven by

4      the parties on this table.

5          THE COURT:  Let me just be real clear.  I've

6      already admitted my simple mind.

7          My role here -- you're seeking to enforce the

8      letter of the agreement.  You have two things to

9      show by a preponderance of the evidence.  And by

10     the way, it is not an evidentiary hearing and

11     there may be a need for that.  It's starting to

12     sound like it.  But if you need -- I believe you

13     need to show that there was a breach and that it

14     was within the -- within the context of this

15     particular agreement, that it was a material

16     breach.  You could have shown more than one, but

17     you only need to show one.  But you need to show

18     that it happened and that it was material.

19         I think that's probably law school stuff.

20     But as I said, I'm simple-minded.

21         MS. IURILLO:  Your Honor, the good news is

22     all the parties have worked very hard together and

23     I believe all the attorneys have let Your Honor

24     know that every exhibit attached to the motions,

25     every e-mail that went between the parties or

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

30

```
 1        counsel for the parties --

 2            THE COURT:  You're telling me there are no

 3        factual disputes?

 4            MS. IURILLO:  There may be factual disputes,

 5        but we've agreed that all of that is admissible

 6        into the record.  So any exhibits in the motions,

 7        any e-mails we address, any HUDs, the parties have

 8        all agreed that they are admissible into evidence

 9        without -- without having --

10            THE COURT:  You affirm that, Mr. Cheatham?

11            MR. CHEATHAM:  Yes, Your Honor.

12            THE COURT:  Okay.  So I'm putting that in my

13        lingo.  I'm saying the documents provided to the

14        Court and to be provided to the Court are

15        stipulated as to accuracy and stipulated that they

16        may be considered for evidence of all purposes;

17        right?

18            MS. IURILLO:  That is correct, Your Honor.

19            THE COURT:  Anything else?

20            MS. HUNEYCUTT:  Yes, Your Honor.

21            THE COURT:  You're a party, too, so you're

22        going to confirm the deal about the evidence?

23            MS. HUNEYCUTT:  Yes.  And I do have some

24        exhibits that are duplicative that we may have to

25        share at some point.
```

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

31

1          THE COURT:  I'm doing pretty well with this

2     particular set, so if it's in A through R of VPC's

3     submission, if you can reference to that letter or

4     cross-reference, it will help move things along.

5          MS. HUNEYCUTT:  You may have to help me on

6     that.

7          The issue of the 72,000, Your Honor, arises

8     from this check that is up on the screen.  It's

9     our Exhibit No. 7, but I don't think it's in

10    dispute by anyone, which was the check that was

11    delivered by Mr. Cheatham around 6:30 after the

12    closing was supposed to occur at 5:00.  And of

13    course, it has the conditional statement that's on

14    there that Ms. Iurillo has already referenced.

15         THE COURT:  Actually, I missed that.  That is

16    the handwritten part?

17         MR. HUNEYCUTT:  The handwritten part says,

18    "Camille, sorry for handwritten note.  I am

19    tendering this to you to be held in trust in light

20    of the incorrect amount on the HUD.  By accepting

21    this, you acknowledge that it is to be applied to

22    complete the purchase and no other reason.  If you

23    do not agree, return it to me immediately," which

24    Ms. Iurillo said she returned it the next day.

25         The next slide, however, is testimony from

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

32

1     Nestor's deposition found at page 165, lines 4

2     through --

3          MR. CHEATHAM:  Your Honor, at this point --

4     the deposition was just transcribed, I believe,

5     yesterday.  Mr. Nestor reserved his right to read

6     the deposition.  He has not had the opportunity to

7     do that.

8          The deposition alone should not be taken into

9     account by the Court as evidence of Mr. Nestor

10    until --

11         THE COURT:  I think under the circumstances

12    of this case, the witness has the privilege to

13    read and correct it.  Mr. Nestor is present in the

14    courtroom.  If he takes issue of the accuracy of

15    the transcription or the accuracy of his own

16    statements, I'll hear that -- I'd be willing to

17    hear that from him.  But you know, I can't bog

18    this thing down for -- you know, my next hearing

19    time is available in January; okay?  So let's --

20    let's do the best we can here.

21         Do you have a copy of the transcript?

22         MR. CHEATHAM:  I was just handed one this

23    morning.

24         MS. IURILLO:  Your Honor, I have a copy for

25    you, if I can approach.

1          THE COURT:  Well, I've got it on the wall

2      here.  Yeah, I'll take the transcript.

3          MS. HUNEYCUTT:  The portion of it is

4      underlined in red.  This is the inquiry that was

5      made as relating to Mr. Nestor's conversation with

6      the title company.

7          And as he states, so as we discussed it, she,

8      meaning the title company, explained to me you

9      cannot bring in cash -- because he was trying to

10     do cash and a cashier's check -- you cannot bring

11     in a cashier's check because cashier's checks are

12     held for 7 to 10 days; it needs to be immediately

13     available U.S. funds.

14         So Mr. Nestor, prior to was privy to what was

15     going on in conversations with the title company,

16     fully understood the title company was only going

17     to take immediately negotiable funds, which the

18     Settlement Agreement also, Your Honor, makes that

19     statement expressly that all funds necessary for

20     closing must be in immediately available funds.

21         The issue about the HUD starts with that

22     there were a variety of HUDs, starting on July the

23     11th.  And the one that was on July 11th, which is

24     our exhibit -- well, this is our Exhibit No. 80,

25     is the cover e-mail where the title company sent

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

34

```
 1          this draft e-mail of July 12 at 4:00 in the

 2          afternoon, I believe it was -- excuse me.  Go to

 3          the next one.  I'm sorry.

 4              This is the one from July the 11th, 2014.

 5          And it was provided to Mr. Nestor.  It, as you

 6          will see, has in the right-hand side in columns

 7          515 and 516 that deposit funds are to come from

 8          Russ Cheatham for 52,000, and on line 516, 20,000.

 9              Under that particular HUD, which was prepared

10          July the 11th, the cash to come from the buyer

11          that's on the bottom left-hand side is 1.274

12          million dollars, which would have included the

13          72,000 that was held by Mr. Cheatham.  On the

14          12th, there were conversations and e-mails between

15          Ms. Bergeron, Monica Bergeron, to Mr. Nestor.

16              THE COURT:  Is that the title agent?

17              MS. HUNEYCUTT:  That's the title person.

18              THE COURT:  While I'm interrupting you, is

19          the title company agent for either -- for any

20          party to this transaction?

21              MS. IURILLO:  No, Your Honor.

22              THE COURT:  Okay.  Go ahead.

23              MS. HUNEYCUTT:  This is a particular e-mail

24          from -- I'm just call her Monica, because people

25          in commonly held positions do; from Monica to
```

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

35

1      Nestor.  This is his e-mail address, and basically

2      says, Hello, based on the info received the amount

3      shown on line 303 is your figure.  And that is the

4      figure that's from that July 11, 4:02 HUD, which

5      is the 1.274 amount.

6          Then there starts being conversations going

7      on where Mr. Cheatham has made a request that the

8      credit be shown on the left side.  So when we had

9      one at July 14th at 9:52, it shows the 50,000,

10     20,000, 72,000 on both sides of the sheet, but it

11     still says, which is very important, that the

12     deposit funds are coming from Russ Cheatham on

13     both sides of it.  And it has then reduced the

14     amount due from buyer to the 1.202.

15         A rapid fire of changes are being made;

16     counsel are involved; all these accounts are being

17     copied on the e-mail; Mr. Cheatham is copied on

18     all of them.

19         This one is at 10:37, which is our

20     Exhibit 62.  And at that point in time the credits

21     have been moved up to lines 204 and 205; it takes

22     on a different number, 1.218 because there is a

23     16,000 that is not accounted for.  Next slide.

24         However, this one, the -- what is our Exhibit

25     No. 63, the July 14, at 11:39 is probably the most

1          important of the documents.  And in red, we have

2          circled the portion that still shows that the

3          72,000 is to be coming from Russ Cheatham, and the

4          dollar amount down at the bottom of the 1.202 is

5          the operative portion.

6               Why this document is important is that

7          Mr. Nestor did not have a purchaser as of July the

8          14th.  His own testimony indicates that he was

9          still sending solicitations out to vast numbers of

10         people trying to get someone to fund the closing

11         the next day.  And with it, he was sending out

12         the -- that HUD that said 72,000 comes from

13         Cheatham and you pay 1.202.

14              In fact, the e-mail -- there's e-mail that

15         basically goes to Mr. -- to a man by the name of

16         Brian Sprague, who is a broker.  He received it at

17         8:00 the night before the closing.  He gave it to

18         Boy Scout Holdings.  Boy Scout Holdings did not

19         know anything about this deal until late morning

20         of July the 15th.  The first time Mr. Nestor ever

21         had a conversation with Boy Scout about purchasing

22         the property was at 1:00 p.m. in the afternoon.

23              This particular exhibit, the one from July

24         the 14th in the afternoon is the one that actually

25         is the HUD.  This HUD at 11:39 is the one that was

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

37

1    attached to the solicitations that Mr. Nestor was

2    sending out to Boy Scout Holdings.

3         And of course, Mr. Nestor has testified, and

4    I can pull those cites for you, testified in his

5    deposition that he never gave Boy Scout a

6    different HUD before 4:30 or so the day of the

7    closing.

8         THE COURT:  So really, your point is that the

9    separate treatment of the 72 -- 74,000 was not the

10   product of title company error, but the product of

11   the manner in which Mr. Nestor solicited an

12   assignee; is that the bottom line?

13        MS. HUNEYCUTT:  Exactly, Your Honor.  And

14   that is actually the position that -- in response

15   to what Mr. Nestor has claimed, there was -- he

16   claims he had one conversation with the title

17   agent about the closing statement, and that would

18   have been on the morning of July the 14th.  And at

19   the morning of July the 14th -- she had already

20   sent him one on the 11th with the right number,

21   then Mr. Cheatham starts having these moved around

22   about these credits, but it's still showing the

23   money coming from them.

24        Mr. Nestor testifies that -- and going back

25   to the issues of the HUDs, there never were any

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

38

1          final HUDs, which Mr. Nestor agreed to in his

2          deposition.  Mr. Nestor testified, again,

3          everything was a draft.  And in the next slide, he

4          kept testifying he kept getting different numbers.

5          And on the 15th he says he had three different

6          HUDs, three different numbers, closing numbers.

7          The number kept changing multiple times.  But he

8          goes on to say, but I didn't add them up; every

9          time I'd get a different number.  I mean, he was

10         not exercising his diligence to find out what he

11         needed to do.

12              And then basically -- we don't need that one.

13              But what occurred here is that they are

14         getting these.  Ms. Iurillo in an e-mail that we

15         were showing to you at side bar was the July 14

16         e-mail at 4:35, I believe it was, which she was

17         simply reporting to the title company what

18         Mr. Cheatham had told her, which was money's not

19         coming from my trust account; it needs to come

20         from the buyer.

21              So the first change when that is made is the

22         next morning.  On July the 15th at 8:35 is the

23         first time the HUD shows up where the money is

24         supposed to come from the buyer.  Now, to the

25         extent that Mr. Cheatham and his client --

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

39

1        Mr. Nestor has testified she didn't represent him
2        in the deal, to the extent they did not coordinate
3        to make sure the money was wired, despite the
4        e-mail that Ms. Iurillo had sent to Mr. Cheatham
5        the day before saying, "Wire the money," "Wire the
6        72,000," and then suddenly there was the
7        communication from Mr. Cheatham to Ms. Iurillo
8        that it's going to come from the buyer, but then
9        it wasn't supplied by the buyer.
10            So in the end, the fact that they claim it's
11       the title company who did this, the title
12       company -- he only had one conversation with her
13       on July the 14th, and at the time he was speaking
14       with her, it was still all of the HUDs had the
15       money coming from Mr. Cheatham.
16            MS. IURILLO:  Your Honor, just one
17       clarification, and that is that the HUD was always
18       in draft; it was never finalized.  And the changes
19       were occurring from Mr. Cheatham and Mr. Nestor.
20            So I dispute Mr. Cheatham's comment that my
21       client approved the HUD.  They didn't even know
22       what the buyer was or what the final HUD was
23       because they were scrambling 14 minutes before the
24       deadline.
25            THE COURT:  The two breaches -- we have two

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

40

1      breaches alleged; right?  Is there another breach

2      that you allege?

3           MS. HUNEYCUTT:  I would like to acknowledge

4      one breach, but it's different.

5           THE COURT:  Argue one breach?

6           MS. HUNEYCUTT:  Argue one breach, yes.  It's

7      different because it's my client N.E. Apartments,

8      and that is --

9           THE COURT:  But your client -- your client is

10     a party to the Settlement Agreement.

11          MS. HUNEYCUTT:  Yes, Your Honor.  Pursuant to

12     the Settlement Agreement, the closing contemplated

13     that my client would also receive $50,000, and

14     would also receive reimbursement of $40,000.

15          The closing never really occurred.  To the

16     extent these monies didn't show up on time, they

17     never -- the documents weren't revised before

18     5:00.  Nothing happened.  There really was not a

19     closing before 5:00.

20          And my client's interest is a little

21     different, but, you know, too little too late;

22     when you try to do a deal four hours before it's

23     to close, it happens that you don't accomplish it.

24     So our client also asserts that there is a breach

25     of the agreement by the failure to have been -- if

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

41

```
1        this had been a closing, it did not occur with my
2        client receiving the consideration.
3            THE COURT:  You referred to something your
4        client was to receive at closing.
5            MS. HUNEYCUTT:  Yes, and it shows up on all
6        the HUDs.  All the HUDs have the 50,000 he is
7        supposed to be paid.
8            THE COURT:  Could you -- wait.  I think I
9        just found it.
10           It's -- it's on page 4 of 12.  I don't know
11       what Roman numeral we're at, but I guess it's --
12       it looks like 2(b).
13           Anyway, it's B if Nestor closes.
14           MS. HUNEYCUTT:  It's up on the screen, yes.
15           THE COURT:  Okay.
16           MS. HUNEYCUTT:  Yes, Your Honor.
17           THE COURT:  That's your consolation prize.
18           MR. CHEATHAM:  Judge, may I respond to this?
19           THE COURT:  You may, briefly.
20           MR. CHEATHAM:  There wasn't a closing.  The
21       Settlement Agreement did not contemplate the
22       entire transaction to close with payment to N.E.
23       Apartments.
24           The closing statement or the Settlement
25       Agreement was very specific that Nestor had to
```

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

42

1        deliver the money and deliver the closing

2        documents contemplated by the contract, not

3        extraneous title company closing statements, but

4        what the contract says.

5             He delivered all of those.  And but for --

6        you know, I understand their argument that it was

7        a last-minute buyer that came in, but that happens

8        in deals all the time.

9             THE COURT:  Yeah.

10            MR. CHEATHAM:  It's not Mr. Nestor's fault

11       that the draft closing statement on the morning of

12       the 15th had the number 102 -- or 1.202 million,

13       that that agreement was given to VPC, or the HUD

14       statement was provided to VPC, too, and they did

15       not say this number is wrong.  In fact,

16       Ms. Iurillo said I'll defer to my client and

17       Mr. Cheatham as of the accuracy to it.

18            Then it's important because I heard say there

19       was never a final closing statement.  That is not

20       correct.  The closing statement that was actually

21       executed by Boy Scout was the draft closing

22       statement provided on the morning of the 15th and

23       clearly says "draft."  But after 5:00, despite my

24       requesting the final closing statement from the

25       title company, after 5:00, they deliver a final

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

43

1         closing statement that's identical to the draft

2         that was delivered that morning.  And that was

3         what we relied upon to -- by the title company to

4         tell us how much money to send.

5              There was other money available as

6         demonstrated by my delivery of the check right

7         after the -- right after the shortage was noted.

8         Had the correct figure been on the HUD, the last

9         two versions of HUD -- keep in mind it's changing.

10        I'm not directing where to move stuff; I'm just

11        saying there is no money coming out of my trust

12        account for this.  Had that number been accurate,

13        a sufficient amount would have been in the title

14        company's hands and the deal would have been

15        closed.

16             THE COURT:  Okay.  Let me ask this.  There

17        have been a few portions of Mr. Nestor's

18        deposition that have been cited to the Court, the

19        transcript.  You made the point that he had a

20        reservation to object.  Do you want to take a

21        minute and see if there is anything that is -- if

22        you need it, see if there is anything disputed in

23        what's been represented in his testimony that was

24        represented to the Court?

25             MR. CHEATHAM:  There is no dispute with those

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

44

1          portions of the deposition, Your Honor.

2              THE COURT:  Okay.  Well, I'm ready to rule.

3          Is there anybody -- is there any substantial

4          argument or bit of material evidence --

5          substantial evidence that I have not heard?

6          Anybody got a major bulletpoint that needs to be

7          stated?

8              MS. HUNEYCUTT:  I would just like to say,

9          Your Honor, one bulletpoint, which is the 72,000

10         does not exist anymore.  And it has never been

11         paid.  And it's our understanding it is not in

12         escrow.  So --

13             THE COURT:  I don't think that helps me

14         decide whether on July 15 there was a breach.

15             MS. HUNEYCUTT:  And there is one other point,

16         Your Honor, that in light of all of our arguments

17         that a related party -- Mr. Nestor has testified

18         that he himself would not have had that money on

19         July the 15th.

20             THE COURT:  Okay.  Well, nobody has shown me

21         that this transaction could not have been

22         rehabilitated, resuscitated and pulled off.  And

23         that's frustrating to the mind in a way, and I

24         think the highfalutin' expression of that is the

25         traditional statement that equity abhors

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

45

1    forfeiture.

2         But, the Settlement Agreement was, itself, an

3    eleventh-hour act of crisis management among

4    intending parties.  It formerly constituted N.E.

5    Apartments as a party to the controversy, known as

6    intervenor in the case, but a party to the

7    Settlement Agreement.  All parties to the

8    Settlement Agreement, it's clearly laid out;

9    there's an eager alternate buyer waiting in the

10   wings, and are parties to the same settlement.

11        There is no doubt in the Court's view that

12   there was a breach -- there were two breaches of

13   the letter of the contract.  The difficult issue

14   is whether they are material breaches given the

15   entirety of the matter.

16        Contrary to what people think about lawyers

17   and judges, most of us hate to pick nits.  But in

18   the context of this case, under the circumstances

19   of the way this agreement was arrived at, the

20   purpose of the agreement and the circumstances of

21   this case, I believe those breaches are material.

22        And I haven't heard any argument about this;

23   I don't know if there is any disagreement, but if

24   the issue at hand was was there a breach -- that's

25   how I framed it.  No one has disputed that.  I

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

46

1      find they were breaches and they were material.

2           The motion asked for some specific relief and

3      I don't know if all of that relief automatically

4      flows as a matter of law from that conclusion that

5      I've just expressed.  Let me take a couple minutes

6      and walk through it.

7           MR. CHEATHAM:  Judge, I feel compelled to

8      point out that the only evidence that you've seen

9      is the evidence of one of the parties.  You

10     haven't reviewed any of Mr. Nestor's exhibits, nor

11     had any testimony.

12          THE COURT:  There are no -- you haven't

13     submitted anything.  The hearing has been

14     scheduled for quite some time.

15          MR. CHEATHAM:  I have my exhibits to proceed

16     with at trial.  I have my trial exhibits, just as

17     they have their trial exhibits.

18          THE COURT:  At a trial of this case that was

19     settled by an agreement -- does somebody have my

20     Order?  That's the first thing I asked for when I

21     sat down here.

22          MS. IURILLO:  I do, if I can approach, Your

23     Honor.

24          THE COURT:  Please.  The Court adopted the

25     Settlement Agreement, ordered the parties to

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

47

1    comply with it, and obtained jurisdiction to

2    enforce it.  It was a Settlement Agreement.  I

3    don't know what there would be a trial about,

4    unless the Settlement Agreement was repudiated,

5    but I think that would be in the lawsuit.

6         MR. CHEATHAM:  When I refer to trial, I mean

7    evidentiary exhibits for today's hearing.

8         THE COURT:  Did you expect to have an

9    evidentiary hearing in 30 minutes dug out at

10   lunchtime on a weekday?

11        MR. CHEATHAM:  Judge, I'm here because it was

12   scheduled.

13        THE COURT:  Okay.  I alluded to the

14   questioning and asked for an evidentiary hearing,

15   and I didn't hear anything.

16        Tell me what -- if you would, if you can

17   identify what material evidence you would -- I'll

18   let you make a proffer to the Court of what your

19   evidence would be and how it would cause a

20   different conclusion from the one I expressed

21   before.  I thought I had heard what you had to

22   proffer.

23        MR. CHEATHAM:  No, Your Honor; I wasn't even

24   started with presentation of my case.  I was just

25   answering the Court's questions and going with the

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

48

1          flow, so to speak.

2               THE COURT:  Well, give me a summary.

3               MR. CHEATHAM:  Okay.  When you say material

4          breach, I assume the lack of --

5               THE COURT:  The 72,000 check instead of wired

6          funds, the assignment without approval to an

7          unrelated party.

8               MR. CHEATHAM:  Your Honor, as far as the

9          materiality of the 72,000 breach, it was clearly

10         not Mr. Nestor's error.

11              THE COURT:  I've heard -- I've heard your

12         evidence on that; haven't I?

13              MR. CHEATHAM:  And the documents will show

14         that -- the documents will show that VPC3 approved

15         the final number that was wired on the draft HUD

16         statement that morning; the evidence would show

17         that the title company finalized the HUD statement

18         with the same identical number which was tendered;

19         the evidence will show from Mr. Nestor that he

20         confirmed with the title company that was what had

21         to be wired to complete the transaction.

22              The title company did all of the allocations

23         and additions and subtractions; not him.  We have

24         the representative from Boy Scout here that will

25         say that the money was there to be wired, but he

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

49

1     was instructed --

2          THE COURT:  I'm taking all of that as a

3     given.  My conclusion assumes, for the sake of

4     analysis, the accuracy of everything you've told

5     me so far, except for I think someone there you --

6     you expressed again that the seller had approved

7     the HUD of the 1.2 instead of 1.274.

8          MR. CHEATHAM:  Yes, Your Honor.

9          THE COURT:  I perceive that to be in dispute.

10    If you have something to show me on that -- I

11    think you already showed me your evidence on that.

12         I don't -- I don't see any basis -- I haven't

13    heard any basis for -- apart from misreading the

14    arithmetic, for the buyer to understand that

15    strict adherence to the Settlement Agreement would

16    be satisfied by wiring 1.2 and bringing a trust

17    account check for 74K.

18         MR. CHEATHAM:  Well, the trust account for

19    the 72K was tendered after the fact to make up for

20    the expressed and acknowledged error by the title

21    company.

22         If the title company had erred in line 303

23    having a larger number, and Mr. Nestor disagreed

24    with it, whether he was right or wrong, if he had

25    not wired the increased amount, he would have

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

50

1        not -- he would have been in breach because that's

2        what the settlement -- the title company told him

3        had to be wired.

4            If he had wired -- if he disputed that, he

5        would have still been required to wire the

6        additional amount; otherwise, no closing would

7        have taken place; the title company would say he

8        didn't tender what they told him he had to tender.

9        So if the converse of that is true, if the title

10       company made a mistake and said this is all we

11       need, the best we can do after that fact is -- we

12       couldn't wire it because it was after 5:00.  The

13       best we could do is wire it the next day or tender

14       the check.  But that was beyond the deadline of

15       the Settlement Agreement as well.

16           And the basis, as I see the Court's announced

17       ruling where you're going, that it punishes

18       Mr. Nestor for a mistake that a third party made;

19       that is basically the boss in a closing is the

20       title company.  If there had been input by VPC3 as

21       to the accuracy or inaccuracy of that 102 -- 1.202

22       number, that would be a different story.  But they

23       sat by silently and Ms. Iurillo said, "I'll defer

24       to my client as to the accuracy of it," and

25       nothing was said.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

51

1          So I think, Your Honor, both parties to this

2      closing were under the misapprehension or

3      misunderstanding of the amount that the buyer had

4      to pay.  Seller didn't seem to care about how much

5      they were getting; they were fine with that.

6          THE COURT:  Maybe I came -- at some point was

7      there not an issue raised about the 72,000 on the

8      15th; like, where is the 72,000?

9          I keep doing this.  It's 74?

10         MS. IURILLO:  It is 72,000, Your Honor.

11         It is on the HUD.  The change in location of

12     the HUD was directed by Mr. Cheatham and

13     Mr. Nestor.  It first was on the buyer's side, as

14     Ms. Huneycutt showed you, and it said

15     Mr. Cheatham's trust account, and it was on the

16     buyer's side.

17         THE COURT:  Which would have been consistent

18     with what ultimately --

19         MS. IURILLO:  But the end number was the

20     same.  It said "buyer" from Mr. Cheatham's trust

21     account, 72, the numbers --

22         THE COURT:  Just -- just address the argument

23     that Mr. Nestor is the victim of the title

24     company's mistake.

25         MS. IURILLO:  Your Honor, this entire mistake

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

52

1          was caused by Mr. Nestor for a number of reasons.

2          One, he waited until the last minute on a deal

3          that he got a third bite at the apple on.  Number

4          two, he and Mr. Cheatham controlled what was on

5          that HUD.  Number three, if you look at the HUD,

6          it says -- first it said from Mr. Cheatham's trust

7          account; the final HUD says on 204 and 205,

8          52,000, 20,000 from buyer.

9               The conversation had been repeatedly that

10         this was coming from a mysterious person, from a

11         mysterious source.  And you cannot look at just

12         one number of a HUD in a 1.274 deal and say, "I

13         looked at line 303 and that's all I had to do."

14              And you look at the entire HUD and you look

15         to see what is due.  And it says "Due from buyer,"

16         right there.

17              And the clerk who is preparing this at the

18         direction of the buyer is not in charge of

19         understanding where the mysterious money came from

20         because at this -- at the -- at 8:41 on July 15th,

21         we don't even know who the buyer is.  Mr. Nestor

22         doesn't know who the buyer is.  But he's changing

23         the numbers.

24              It couldn't be clearer.  And that's why I

25         said earlier, Your Honor, there is a history

53

1       behind it.  It's right there; 204, 205, due from

2       buyer.

3            THE COURT:  Any other proffer, Mr. Cheatham?

4            MR. CHEATHAM:  Yes, Judge, it's -- somehow

5       the statement that we're --

6            THE COURT:  Proffer is evidence, not

7       argument.  It's a summary of the evidence that you

8       have been given an opportunity to present.

9            MR. CHEATHAM:  The title company was chosen

10      by the seller.

11           THE COURT:  Okay, I asked about half an hour

12      ago if anybody was contending that the title

13      company was the party's agent.

14           MR. CHEATHAM:  It's not their agent; the

15      title company was chosen by the seller.  So to

16      suggest that the buyer was somehow controlling the

17      title company or the HUD-1 is not the case.

18           And if you can't rely on the line 303 in

19      bold --

20           THE COURT:  This is an argument.  I'm

21      asking -- I made my ruling.  You told me that

22      there is material evidence that the Court failed

23      to consider.  If you convince me of that, I will

24      find some way to continue this hearing and find

25      some time for evidentiary hearing.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

54

1          MR. CHEATHAM:  The only other evidence that I

2      think the Court should consider is the closing

3      statement from -- the final closing statement that

4      was provided to -- by the title company to

5      everybody else at 5:00, but to me at 5:48.  It has

6      the identical 1.202.  That isn't in any of the

7      exhibits attached to the motion, but I have that

8      exhibit that I would like to proffer into

9      evidence, or submit into evidence.

10         THE COURT:  You can just file it.  I assume

11     all these other exhibits that are attached to

12     pleadings are part of the Court file.  You can

13     file it.

14         Bear in mind, I have also concluded that the

15     first issue raised, the assignment, was a material

16     breach.  So I'm basing my decision on both

17     grounds.

18         I understand your argument about the closing

19     statement.  I think I've considered what you have

20     been able to proffer in evidence, and it doesn't

21     change my conclusion, regrettably.

22         I was turning to the relief sought.  And this

23     is -- I'll give this back.  Whoever gave me the

24     order, you can have that back.

25         MS. IURILLO:  Would you like me to approach,

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

55

1          Your Honor, and take that document?

2               THE COURT:  Yes.  You can take that

3          transcript also.

4               MS. IURILLO:  Thank you, Your Honor.

5               THE COURT:  I am looking at the -- what I

6          call the "wherefore" clause in N.E. Apartments'

7          motion.

8               I am looking for the order that -- you have

9          an escrowed letter terminating the Nestor

10         contract?

11              MS. HUNEYCUTT:  There is the -- in the

12         paragraph of the Settlement Agreement --

13              THE COURT:  I remember.  I remember.  I'm

14         looking for an order --

15              MS. HUNEYCUTT:  These are some of the

16         documents, yes, Your Honor.

17              THE COURT:  I assume that's consistent with

18         the Court's decision directing the parties to

19         proceed pursuant to the Settlement Agreement with

20         the closing to N.E. Apartments.

21              Those are consistent with what you're asking

22         for, Ms. Iurillo; correct?

23              MS. IURILLO:  I am turning to that page, Your

24         Honor, as we speak.

25              THE COURT:  Well, just order VPC to deliver

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

56

```
 1        the documents to terminate the Nestor contract,

 2        direct the parties to proceed with all necessary

 3        actions to close the sale to N.E. Apartments.

 4             MS. IURILLO:  That's consistent.

 5             I have some additional items.

 6             THE COURT:  Well, I know you do.  Remember?

 7        Linear.  And we'll talk about the other part of

 8        that momentarily.

 9             MS. HUNEYCUTT:  Your Honor, if I might add

10        one thing.  Obviously, when we filed the Motion

11        for Enforcement, it was -- August 18th has come

12        and gone.  And we would simply be asking also for

13        us to be able to close within 30 days.

14             THE COURT:  Okay.  The VPC motion asked for

15        the finding that I've expressed, requirement to --

16        requiring Nestor -- who is BS?  Oh, Boy Scout --

17        who is BSH?

18             MS. IURILLO:  BSH is Boy Scout Holding, but

19        since the failed closing, Boy Scout Holding has

20        reassigned the contract.

21             THE COURT:  I really don't want to know that.

22        Is somebody asking for some other escrowed

23        documents -- asking for -- the (c) of your

24        "wherefore" clause is asking that Mr. Nestor and

25        his assignee be ordered to release and record
```

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

57

1          escrow documents?  It's your motion.

2                MS. IURILLO:  Your Honor, I think you said it

3          better, but basically we're looking for the

4          documents that were held in escrow; a notice of

5          lis pendens, a release of lis pendens, a dismissal

6          with prejudice --

7                THE COURT:  Okay, so let's go to the next

8          one.

9                MS. IURILLO:  Basically all documents.

10               THE COURT:  Basically we have fees and costs,

11         and then your amendment asks for an additional

12         order of about 74,000 (sic), I think; right?

13               MS. IURILLO:  Yes, the amendment.

14               THE COURT:  I keep saying that.  72,000?

15               MS. IURILLO:  That's correct, Your Honor.

16               THE COURT:  It does say 72.  Doesn't it say

17         74 somewhere?

18               MS. HUNEYCUTT:  It says -- 74 was the number,

19         1.274 on the HUD.

20               THE COURT:  That's where I got that.  Thank

21         you.  I thought -- it's 72.

22               MS. IURILLO:  And the amendment for the

23         72,000 to be delivered since it was a

24         nonrefundable deposit due for an extension.

25               THE COURT:  Okay.  Both VPC and N.E. are

Proceedings Held Before The Honorable Jack Day - Vol. I - September 4, 2014

58

1        asking for fees and costs.  I won't be addressing

2        that today.  You can file your motion stating your

3        entitlement and schedule that for a separate

4        hearing as to entitlement.  Probably as to

5        entitlement and amount.  And I will ask, if you

6        can elaborate, to the extent you can agree on some

7        portion of that, you know, with reservation of

8        rights, obviously, then do so.

9            As to the 72, Mr. Cheatham, is there a legal

10       dispute -- assuming for the sake of argument, is

11       there an issue about VPC's entitlement to the 72K?

12           MR. CHEATHAM:  Yes, Your Honor, that's not

13       been in any relief in the underlying action asked

14       for, and it is specifically not addressed and

15       preserved -- reserved or preserved in the

16       Settlement Agreement.

17           There was nothing in the Settlement

18       Agreement -- it could have been.  It wasn't --

19       that said Mr. Nestor has to pay this now.  I'm

20       kind of surprised it wasn't.

21           To continue to be --

22           THE COURT:  Well, you got the amendment to

23       their motion; right?

24           MR. CHEATHAM:  Yes, I've seen it.

25           THE COURT:  Okay.

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

59

1          MR. CHEATHAM:  What they're trying to do is

2     seek additional relief that is preserved in the

3     Settlement Agreement, which settled the lawsuit.

4          THE COURT:  The 72 is an obligation pursuant

5     to the original contract; right?

6          MR. CHEATHAM:  But it was punted towards the

7     end to be paid at closing as part of the closing

8     price.

9          THE COURT:  Okay.  So you have an argument

10     that my holding vitiates that obligation, that the

11     Settlement Agreement supercedes that obligation,

12     except to the extent that it's a Court order?

13          MR. CHEATHAM:  Yes, I do, Your Honor.

14          THE COURT:  Okay.  That's a bona fide

15     dispute.  Make your motion and we'll have a

16     hearing on that.  Make your motion.

17          I encourage you, without building a whole law

18     library, if you give me some written responses,

19     that would help tip it up for the hearing; okay?

20          So the parties will be -- or the VPC and N.E.

21     parties, abbreviation parties that are not

22     actually people, are going to be filing its

23     scheduled motions for fees and costs, and VPC will

24     do its motion regarding the 72,000, and that will

25     be heard -- I would hope and expect to try to deal

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

60

```
 1        with those at one hearing at a time in the future.

 2        If there is any basis to narrow those issues

 3        between now and then, please do so.

 4             Anything else to come before the Court?

 5             MS. IURILLO:  Yes, Your Honor.  N.E.

 6        Apartments and VPC agreed that the closing will

 7        occur between the parties by September 30th, and

 8        we ask that that be part of the order today, since

 9        N.E. Apartments was part of the Settlement

10        Agreement and now the closing has changed.

11             THE COURT:  That's between you.  That's not a

12        subject for me to order.

13             MS. IURILLO:  Very good.

14             THE COURT:  I don't -- I have no -- I have no

15        opinion about that.

16             MS. IURILLO:  Understood, Your Honor.  If I

17        could indulge --

18             THE COURT:  Sorry?

19             MS. IURILLO:  If I could indulge the court

20        for two minutes?

21             THE COURT:  No, you're not indulging the

22        Court; the Court has been indulging you for about

23        45 minutes.

24             I'll give you a minute-and-a-half.

25             MS. IURILLO:  That would be the correct
```

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

61

```
 1        terminology.  Thank you, Your Honor.

 2             Just so we don't -- do not -- as you said, we

 3        narrowed the issues on the 72,000.  What we talked

 4        about, the Contract for Purchase and Sale that was

 5        reinstated pursuant to the agreement, we're asking

 6        for those terms to be honored.  And we have a

 7        Settlement Agreement that has specific terms that

 8        do not change -- some terms that change the

 9        contract and other terms that are left out.

10             I guess what Your Honor is saying is you

11        don't want to hear any more about that today and

12        we will -- we will go ahead and file that motion.

13             THE COURT:  Mr. Cheatham -- you are talking

14        about the payment -- basically the payment of the

15        72,000?

16             MS. IURILLO:  That is correct, Your Honor.

17             THE COURT:  Mr. Cheatham disputes your legal

18        interpretation.  There was no issue that that

19        flows from what the Court has held in regards to

20        the breach as materiality.  I can get there now.

21        There is a dispute; it's a dispute of law that I

22        think you both are going to need to brief and/or

23        argue.  And I'll address that later.

24             MS. IURILLO:  Thank you, Your Honor.

25             THE COURT:  If I have to.  He is not saying
```

Proceedings Held Before The Honorable Jack Day - Vol. I -
September 4, 2014

62

1        he is blind-sided by it, but there is not -- you

2        know, it was an amendment to your motion, oh, by

3        the way, you know, we still have the 72,000.  That

4        may be right, but he says it's wrong.

5             I understand the argument he wants to make.

6        We'll give you both a chance to argue about that

7        at another time.

8             MS. IURILLO:  Thank you, Judge.

9             THE COURT:  Court's adjourned.  Please put

10       the courtroom back the way you found it.

11            (The Proceedings concluded at 1:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

63

1                CERTIFICATE OF COURT REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PINELLAS

5

6           I, KELLEY N. SIMPSON, RPR, do hereby certify
     that I was authorized to and did stenographically
7    report the Proceedings held before The Honorable Jack
     Day; and that the foregoing transcript is a true and
8    correct record of my stenographic notes.

9           I FURTHER CERTIFY that I am not a relative,
     employee, or attorney, or counsel of the parties, nor
10   am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
11   financially interested in the action.

12          DATED this 13th day of October, 2014, at
     Pinellas County, Florida.

13

14

15   _____

16          Kelley N. Simpson, RPR

17

18

19

20

21

22

23

24

25